IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Crim. No. 1:09-cr-228 (TSE) |
| | ) | Next Event:  Sentencing, June 11, 2010 |
| LLOYD MALLORY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT LLOYD MALLORY'S POSITION ON SENTENCING

### PRELIMINARY STATEMENT

The government's position on sentencing lacks any sense of proportionality and ignores

the sage guidance recently promulgated by the United States Attorney General:

> Persons who commit similar crimes and have similar culpability should, to the
> extent possible, be sentenced similarly.  Unwarranted disparities may result from
> disregard for this fundamental principle.  They can also result, however, from a
> failure to analyze carefully and distinguish the specific facts and circumstances of
> each particular case.  Indeed, equal justice depends on individualized justice, and
> smart law enforcement demands it.

Memorandum from Attorney General Eric H. Holder, Jr. to All Federal Prosecutors (May 19,

2010).

One need look no further than this past weekend's Washington Post Magazine to find the

story of Vijay Taneja.  Even though Taneja's Guidelines range was 97 to 121 months, Taneja

received seven years in prison *at the government's request* for a scheme that may have begun as

early as 1999 and, according to the bankruptcy trustee, may have involved a loss of 150 million

dollars (although at the time of his plea, Taneja's statement of facts indicated a loss of around 33

million dollars).  *See* Annie Gowan, *Bollywood Mirage:  The rise and fall of Vijay Taneja*, The

Washington Post, June 6, 2010, available at http://www.washingtonpost.com/wp-

dyn/content/article/2010/05/28/AR2010052803388.html, last visited June 7, 2010.  Ignoring

General Holder's guidance, the government here advocates a sentence in the range of 87 to 108 months—more than that received by Taneja, who may have perpetrated the largest solo bank fraud in the history of this judicial district.[1]

One need look no further than the government's own press releases to find the story of Ruben Rojas, who was sentenced to 60 months in prison "for leading a mortgage fraud scheme that caused more than $9 million in losses."  Press Release, United States Attorney's Office for the Eastern District of Virginia, *Leader of $9 Million Mortgage Fraud Scheme Sentenced [to] 60 Months in Prison* (May 7, 2010).  Although Rojas's sentence was reduced due to his cooperation, the government advocated for an initial sentence of 87 months—the same as it asks for here.

And one need look no further than *this case* to find the stories of others who participated on a much broader and deeper level than the government's view of Mr. Mallory's participation and who received sentences of between two and one-half months to 21 months. Yet now the government seeks to minimize their involvement or their prior criminal records in order to justify their extreme position here.  Apparently, the government has never encountered a sentencing disparity that was unwarranted.

Take, for example, Melanie Ekstrom.  Ekstrom originally received 27 months, later reduced to twelve months and one day.  Her participation is best analyzed using her own words:

> **Q.**  When you stated that almost every loan you did with Mr. Milan or Mr. Aslanpour was fraudulent, was that throughout the course of your career with him?
>
> **A.**  Yes.
>
> **Q.**  How long did that last in terms of years?
>
> **A.**  I think roughly four years.
>
> $*$        $*$        $*$

---

[1]  Taneja was prosecuted by Assistant United States Attorney Stephen P. Learned.

**Q.** In fact, your job was to fool banks into giving you hundreds of thousands of dollars at a clip, right?

**A.** Yes.

*      *      *

**Q.** The question was you wanted the big fraudulent money, correct?

**A.** Yes.

*      *      *

**Q.** What's the highest estimate of the amount you tricked these sophisticated banks into giving you that you have as you sit here today, the highest estimate that you can fairly come up with?

**A.** On one loan or --

**Q.** No. The entire package.

THE COURT: He wants to know what is your estimate as you sit here today of the total amount of the loans that were fraudulent during the period that you worked for Mr. Milan? Do you have an estimate?

THE WITNESS: Maybe anywhere from 75 to 100 million.

Trial Transcript, March 23, 2010, pp. 35-36, 37, 40, 41.

Prior to getting credit for cooperating, Ekstrom, a Criminal History Category II, received a below-Guidelines sentence of 27 months. Then she lied to FBI Special Agent Spencer Brooks after her release—and the government took no action against her.

The government essentially puts Mr. Mallory's culpability on a par with Michael Milan's, a repeat fraudster who was the maestro of this scheme and who fled the country when he realized his indictment was imminent. This position is completely unjustified and lacks credibility.

<u>STANDARDS FOR SENTENCING</u>

Pursuant to 18 U.S.C. § 3553(a)(2), the court "shall impose a sentence sufficient, but not greater than necessary," to accomplish the purposes set forth in the statute. The statute directs the Court to consider, among other factors, the history and characteristics of the defendant as

3

well as the nature of the offense when determining what sentence to impose.  *See* 18 U.S.C.

§ 3553(a)(1).  And, although the statute instructs the judge to consider the advisory Guidelines

among other factors, "the sentencing court does not enjoy the benefit of a legal presumption that

the Guidelines sentence should apply."  *Rita v. United States*, 551 U.S. 338, 351 (2007).  *See*

*also United States v. Herder*, 594 F.3d 352, 362 (4th Cir. 2010) (stating that "the Supreme Court

*forbids* sentencing courts to presume that a sentence within the applicable Guidelines range is

reasonable") (emphasis added).  Instead, the Guidelines simply "reflect a rough approximation of

sentences that might achieve § 3553(a)'s objectives."  *Rita*, 551 U.S. at 350.

1.      **The Nature of the Offense.**

        The nature of the offense, although serious, is nonviolent.  Mr. Mallory was brought into

the conspiracy in an unknowing fashion, working for Mr. Milan as a consultant for his Coollid

business.  And without seeking to minimize the offenses of which Mr. Mallory has been

convicted, there was a much broader and extensive scheme involving hundreds of loans that

Mr. Mallory had no involvement in whatsoever.  The nature of Mr. Mallory's conduct does not

warrant a lengthy term of incarceration.  Indeed, when the Court inquired directly of

Ms. Ekstrom how Mr. Mallory knew the documents he was preparing were false, she responded

"I guess I really can't say how."  Trial Transcript, March 22, 2010, p. 73:8-12.  Certainly, he

gained what can only be described as a modest fee from the transactions in which he was

involved.   Indeed, the evidence showed he was paid less than $20,000, some of which

constituted consulting fees for Coollid.  Under these circumstances, and in comparison to others

similarly situated, a lengthy prison term would create a significant sentencing disparity that is

entirely unwarranted, unless one adopts the inadvisable concept that a so-called trial penalty is an

appropriate sanction for courts to impose.

**2.      History and Characteristics of Mr. Mallory.**

Mr. Mallory is a 48 year old man with no prior criminal record.  He has a record of service to the community, as reflected in the letters of support attached as Exhibit 1.  (Counsel received over fifty letters of support for Mr. Mallory attesting to his good works and good character and urging the Court to impose a lenient sentence.  The letters attached are a representative sample.)

Without reiterating what is set forth in the presentence report or the letters of support, it is apparent that the offenses for which Mr. Mallory has been convicted are out of character for him. While he must be punished, two felony convictions for a licensed professional and aspiring minister are no small punishment.  In the larger context of a life made up of hard work and good works, they are significant punishment in and of themselves.

**3.      The Loss Calculation.**

The main issue with respect to the Guidelines is the loss calculation.  Specifically, the issue here is foreseeability of the loss (or alternatively, loss causation), which requires accounting for the effect the housing crash had on the value of the property that was the security for the loans.  Under Application Note 3(A)(i) to § 2B1.1, actual loss means "the *reasonably foreseeable* pecuniary harm that resulted from the offense."  USSG § 2B1.1, Application Note 3(A)(i) (emphasis added).  In turn, Application Note 3(A)(iv) defines reasonably foreseeable pecuniary harm to mean "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  *Id*., Application Note 3(A)(iv).  In other words, if the government wants to count loss that resulted from the impairment of the value of the property due to market conditions, it has to show that Mr. Mallory knew or reasonably should have known that the housing crash was coming.  Given that

sophisticated banks were loaning money at 95% to 100% loan-to-value ratios on the loans involved in this case and that those banks (and the government) were caught by surprise, one cannot justifiably assert that Mr. Mallory should have foreseen what they did not.

"For example, a fraud disclosed just as the dot-com bubble burst might cause most, but not necessarily all, of the decline in previously high-flying technology stocks.  Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud." *United States v. Rutkoske*, 506 F.3d 170, 179-80 (2nd Cir. 2007).

Here, the appraisers who conducted many of the appraisals at issue have offered such expert opinion.  Attached to the presentence report are declarations from appraisers Mike Gomez and Michael L. Heup.  On two critical issues, both have stated:  (1)  to a reasonable degree of certainty, based on their experience and expertise as general real estate appraisers, at the time these appraisals were performed, one would have expected that a foreclosure would result in a sale price in the range of eighty to eighty-five percent of the fair market value of those properties; and, (2) in their opinion, the subsequent deterioration in the market (and thus the fair market value of these properties) *was not reasonably foreseeable* at the time they performed these appraisals.  *See* Declaration of Mike Gomez, ¶¶ 4-5; Declaration of Michael L. Heup, ¶¶ 4-5, attached as Exhibit 2.  *See also* Declaration of Sherry Brennan, attached as Exhibit 3 (stating she "noted that property values in the area of the subject property were stable and that the demand and supply for properties in the relevant market were in balance" and that "[b]ased on these factors, in my opinion, the subsequent deterioration in the market (and thus the fair market value of this property) was not reasonably foreseeable at the time I performed this appraisal").

As a result, if one calculates the foreseeable loss at 85% of the fair market value of the properties, the loss figure for purposes of the sentencing Guidelines is $857,939.50 (*see* spreadsheet attached as Exhibit 4), resulting in a four point reduction.  If all other factors remain the same, the resulting Offense Level Total is 23 (not 27) and the advisory Guidelines range is 46 to 57 months, the starting point for the Court's sentencing analysis.

**4.      The Need to Address Legitimate Objectives of Sentencing.**

18 U.S.C. §3553(a)(2) directs the sentencing court to consider:

[T]he need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §3553(a)(2).

With respect to the seriousness of Mr. Mallory's participation in the offense, as the Court knows, Michael Milan orchestrated the fraud and Melanie Ekstrom acted as the clearinghouse for it.  Ms. Ekstrom testified that the scheme with Mr. Milan lasted for many years, and that every loan that she assisted him with involved some type of fraud.  She estimated that the total amount of loans processed by her on behalf of Mr. Milan could have been in the hundred million dollar range.   Mr. Mallory was involved in a small fraction of those loans.

Mr. Mallory is acutely aware of the impact that such schemes have had and will continue to have on the nation's economy.  This notwithstanding, it is respectfully submitted that a recognition of the seriousness of the offense does not necessarily compel the imposition of a

lengthy term of incarceration.  An analysis of all of the sentencing factors and sentencing policy suggest that a term of probation, or a minimal prison sentence coupled with supervised release, can be imposed that does in fact recognize the seriousness of the offense.

Deterrence of criminal conduct is one of the major considerations embodied in 18 U.S.C. § 3553.  Certainly, the lessons Mr. Mallory has learned over the past year suggest that the consequences of criminal conduct are dire and severe:  Mr. Mallory has lost his career as an accountant and business owner.  Due to his age and the crime of conviction, his general overall potential for employability is severely curtailed if not eliminated.  He has been and will continue to be publicly embarrassed and ashamed.  As a criminal offender, he will be labeled a "felon" for life.

Moreover, the judicial system is well-equipped to provide adequate means of deterrence. By imposing a term of probation, or a minimal period of incarceration, along with a period of supervised release with special conditions, the Court can fashion a punishment with systemic safeguards.

For instance, monitored through the Probation Office, the Court can require that Mr. Mallory inform any potential future employer of his crime; the Court can require that Mr. Mallory not be employed in a position in which he uses his accounting skills; he can be required to submit to home confinement conditions; and ordered to submit detailed financial statements (as he already has), along with any other conditions the Court believes will adequately deter future criminal conduct.  Through the imposition of detailed special conditions, the Court, with the assistance of the Probation Office, can impose a sentence with adequate safeguards short of imposing a lengthy term of incarceration.

There is little research—academic, judicial, anecdotal, or otherwise—that suggests that prison deters nonviolent crime.  In fact, most research appears to suggest the contrary—that the longer one is in prison, the higher the likelihood of recidivism.  A May 2004 study conducted by the United States Sentencing Commission belies the notion that a period of incarceration for a first-time offender has any positive effect on rates of recidivism.  *See Recidivism and the "First Offender,"* United States Sentencing Commission, May 2004, available at:

www.ussc.gov/publicat/Recidivism_FirstOffender.pdf, last visited June 2, 2010.  In fact, the conclusion of the study appears to point to the contrary:  The more involvement one has in the criminal justice system and the longer the prison sentence, the higher the rate of recidivism.  An analysis of the study suggests that recidivism risk is lowest for those offenders with the least experience in the criminal justice system.  To some, these results are not surprising.  In 2001, Judge Weinstein of the Eastern District of New York noted that:  "It is not surprising that rehabilitation continues to be linked primarily with failed attempts to reform inmates while they are incarcerated.  The great shortcomings of the American rehabilitative model have taken place in the context of incarceration.  *See, e.g.*, *Powell v. Texas*, 392 U.S. 514 (1968) (plurality opinion) (Marshall, J.).  ('[I]t can hardly be said with assurance that incarceration serves [therapeutic or rehabilitative] purposes . . . for the general run of criminals')."  *United States v. K*, 160 F. Supp. 2d 421, 429 (E.D.N.Y. 2001).

The Sentencing Reform Act has always provided sentencing judges with flexibility to consider which of the core sentencing principles—retribution, deterrence, incapacitation, and rehabilitation—are most important in a particular case, and to provide alternatives to incarceration where necessary in carrying out statutory goals.  Indeed, Congress recognized that the sentencing judge must have the flexibility to emphasize one purpose of sentencing over

others based upon the individual circumstances of an offender and an offense. *See*, S. Rep. No. 98-225, at 58-59 (1983) ("The intent . . . is to recognize the four purposes that sentencing in general is designed to achieve, and to require that the judge consider what impact, if any, each particular purpose should have on the sentence in each case.").

The need to protect the public from Mr. Mallory is one of the critical sentencing factors to consider. However, it can hardly be suggested that Mr. Mallory is a hardened criminal with a history of endangering public safety or placing anyone at risk. In fact, as demonstrated by the numerous letters submitted in support of Mr. Mallory, quite the opposite is true. It is indeed shocking that a man who is held in such high regard by his family, friends, parishioners, and clients finds himself where he stands today.

Incapacitation for the purpose of protecting the public is certainly not a penological objective that is warranted in Mr. Mallory's case. To be sure, Mr. Mallory is not a physical threat to the public and the only matter of concern is to prevent him from committing financial crimes. Debarment from the financial industry and supervised release conditions can have the same effect of protecting the public from future criminal activity. If Mr. Mallory is precluded from such activities, the prospect of him reoffending diminishes to zero. Importantly, Mr. Mallory never caused any physical harm to anyone and does not need to be isolated from the community as a means of societal protection.

The need to provide the defendant with needed educational, correctional, and vocational militates in favor of sparing Mr. Mallory from a substantial term of imprisonment. A period of incarceration beyond what was given to other defendants in this matter (all of whom, with the exceptions of Mr. Milan and Mr. Evans—both prior felons—served less than a year in prison) is nothing more than retributive punishment that will not provide him with any needed vocational,

correctional, or educational opportunities.  Community-based programs can provide him with any needed assistance without imposing the trauma of imprisonment on him, his family, and his parishioners.

Given the significant punishment he has already suffered and will continue to suffer, an appropriate sentence here is probation, or, if the Court determines that incarceration is appropriate, a term of imprisonment consistent with the other, similarly-situated defendants in this matter.  Such a sentence would satisfy any need for retribution.

## CONCLUSION

The observations made by this Court almost twenty years ago in the case of a lawyer who pled guilty to a drug conspiracy remain equally pertinent today:

> Sentencing is not an exact science.  Guidelines, while effective to eliminate arbitrary disparities, nonetheless import into the sentencing process an illusory mathematical precision that, when slavishly followed, is antithetical to effective and conscientious sentencing.  Ultimately, the sentencing decision is as intensely human and emotional as it is analytical; it is a quest for a sentence that best effectuates the criminal justice system's goals of deterrence (general and specific), incapacitation, retribution and rehabilitation.  Specific deterrence, incapacitation and rehabilitation were essentially irrelevant in Morris' case; there is no significant likelihood that he will engage in future criminal conduct, whatever the sentence.  Nor does retribution call convincingly for a lengthier sentence.  To be sure, those involved in narcotics conspiracies are purveyors of poisons that cause incalculable human harm and threaten to rend the fabric of our society.  Parents and loved ones of addicted customers of the conspiracy understandably want retribution.  In this instance, however, two years in prison, coupled with disgrace and disbarment after a life spent in the law seemed enough retribution, especially given the substantial community support Morris enjoyed and the evidence that he had, in earlier times, achieved some success at the bar.  His criminal conviction and presumably, his disbarment, does not erase the good he achieved in his life, but it certainly tarnishes and degrades it and the stigma of this is, indirectly, part of the retributive effect of the sentence.  More retribution seemed excessive.

*United States v. Morris*, 837 F. Supp. 726, 729 (E.D. Va. 1993).

For all of these reasons, Mr. Mallory's requested sentence is a fair, reasonable, equitable, and balanced approach to sentencing and satisfies all of the competing interests and

considerations.  The sentence Mr. Mallory suggests will punish and deter him, given that he is a person who shows no likelihood of repeat behavior, while the ultimate goals of reformation and rehabilitation will also be furthered.  Such a sentence will also leave Mr. Mallory with the ability to serve the community and, quite literally, to repay his debt to society.

LLOYD MALLORY
By Counsel

_____/s/_____
Steven T. Webster, Esq.
Virginia Bar No. 31975
Aaron S. Book, Esq.
Virginia Bar No. 43868
Brian C. Athey, Esq.
Virginia Bar No. 66515
Webster Book LLP
300 N. Washington St., Suite 404
Alexandria, Virginia  22314
Phone:  888-987-9991
Fax:  888-987-9991
abook@websterbook.com
Counsel for Defendant Lloyd Mallory

## CERTIFICATE OF SERVICE

I hereby certify that on June 7, 2010, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Stephen P. Learned, Esq.
Edmund P. Power, Esq.
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Ave
Alexandria, VA 22314


_____/s/_____
Aaron S. Book, Esq.
Virginia Bar No. 43868
Webster Book LLP
300 N. Washington St., Suite 404
Alexandria, Virginia  22314
Phone:  888-987-9991
Fax:  888-987-9991
abook@websterbook.com
Counsel for Defendant Lloyd Mallory