

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:09cr228 |
| | ) | |
| LLOYD MALLORY, | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

A jury convicted defendant of conspiring to defraud lenders into issuing mortgage loans to unqualified homebuyers, many of whom subsequently defaulted on those home loans. At sentencing, the principal contested issue was the loss calculation for purposes of USSG § 2B1.1. Distilled to its essence, defendant argued that he should not be held responsible for the diminished foreclosure sale value of properties underlying the fraudulently induced home loans, as the market downturn that caused the decrease in value was not reasonably foreseeable to him at the time of his fraudulent conduct. The government contended that the market downturn was reasonably foreseeable to defendant, and thus he should be saddled with the full loss amount. This Memorandum Opinion memorializes and elaborates upon the reasons for the bench ruling in this matter, which ruling held that the later foreclosure sale value need not be reasonably foreseeable to a defendant at the time of his fraudulent conduct provided that the loss of the unpaid loan principal is a reasonably foreseeable consequence of the fraud.

I.

Defendant, Lloyd Mallory, was charged in a superseding indictment with (i) conspiracy to commit wire and mail fraud pursuant to 18 U.S.C. § 1349, (ii) wire fraud pursuant to 18 U.S.C. §

1343, and (iii) mail fraud pursuant to 18 U.S.C. § 1341. At trial, evidence was adduced that defendant, a certified public accountant, prepared fraudulent tax returns and employment and asset verification letters between 2006 and 2008. These false documents were relied on by financial institutions to qualify individuals for home loans that they otherwise would not have received. And when, not unpredictably, these unqualified borrowers defaulted on their loans, the banks were left to recover whatever they could through foreclosure sales, a process rendered even more unappealing from the banks' perspective by the fact the housing market was deteriorating during this time period.[1] Thus, the banks were forced to sell the houses for significantly less than the outstanding principal owed on the loans. The jury convicted defendant on the mail fraud and conspiracy counts, but acquitted him on the wire fraud count.

At sentencing, the principal contested issue was the calculation of actual loss pursuant to § 2B1.1. The probation officer, in her presentence investigation report ("PSR"), calculated this loss by including the full amount of unpaid principal from eleven subject loans, less a credit for the amount actually recovered by the defrauded financial institutions from foreclosure sales of the homes. This method of calculation resulted in an actual loss amount in excess of $2,500,000—specifically, $2,797,855—and the addition of 18 offense level points to the base offense level pursuant to § 2B1.1(b)(1)(J). Defendant objected to this calculation, arguing that the "credit against loss" calculation should be based not on the actual amount recovered through foreclosure sales, but rather on the amount that defendant, at the time of the fraudulent acts, reasonably could have expected to be recovered from later foreclosure sales. Because his

---

[1] As discussed below, it is worth noting that this deterioration in the housing market was in no small part due to mortgage fraud schemes such as that perpetrated by defendant and his coconspirators.

fraudulent conduct occurred between 2006 and 2008, while the housing market was showing significant signs of weakness, but before the more dramatic collapse in housing prices in late 2008 and early 2009, defendant argued that he could not have foreseen that the defrauded banks would have recovered as little as they did from the foreclosure sales. In support of this argument, he presented affidavits from appraisers who appraised the subject properties during 2006 and 2007. These appraisers averred (i) that their appraisals were accurate when made, (ii) that a foreclosure sale should have resulted in a sale price of 80 to 85 percent of the appraised value, and (iii) that the subsequent market deterioration was not reasonably foreseeable. *See* Def. Ex. 2–4. Based upon these affidavits, defendant contended that the appropriate actual loss amount was somewhere between $1,000,000 and $2,500,000, and therefore 16 offense level points—rather than 18—should have been added to his base offense level pursuant to § 2B1.1(b)(1)(I).

After oral argument, defendant's objection to the PSR with respect to the loss calculation issue was overruled. Accordingly, 18 points were assessed for the actual loss amount. After ruling on other objections, it was determined that defendant's total offense level was 29 and, with a criminal history category of I, his Guidelines range was 70 to 87 months. Had defendant's objection on the loss calculation issue been sustained, his total offense level would have been 27 and his Guidelines range 57 to 71 months. In the end, defendant was sentenced to 60 months' imprisonment, a variance sentence pursuant to 18 U.S.C. § 3553(a) that represented a significant decrease from his Guidelines range and also was at the low end of the Guidelines range that would have applied had defendant's loss calculation objection been sustained. The record makes it pellucidly clear that the same sentence would have been imposed in the event that defendant's

objection on the loss calculation issue had been sustained. Also at sentencing, a restitution judgment was entered in the amount of the actual loss as computed by the probation officer—$2,797,855. This Memorandum Opinion memorializes and elaborates upon the reasons for the bench ruling on the actual loss calculation in this matter.

## II.

The analysis properly begins with the relevant provisions of the advisory Guidelines. Specifically, § 2B1.1 provides that defendants convicted of certain enumerated offenses, including crimes of fraud and deceit, are subject to an enhancement based on the amount of the loss resulting from the offense conduct. *See generally* § 2B1.1(b)(1). The Application Notes to that section clarify that "loss" is defined as the greater of "actual loss" or "intended loss." *See* App. Note 3(A).[2] Pertinent here is that actual loss is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." App. Note 3(A)(i). The Application Note further clarifies that reasonably foreseeable pecuniary harm (i) is harm that "the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense," and (ii) does not include interest of any kind. App. Note 3(A)(iv), 3(D)(i).

This does not end the Guidelines' guidance on actual loss calculation. Additionally, a provision of Application Note 3 entitled "Credits Against Loss" provides that in cases involving pledged collateral—as in the case of a home mortgage—the calculated loss shall be reduced by "the amount the victim has recovered at the time of sentencing from disposition of the collateral." App. Note 3(E)(ii). Importantly, therefore, § 2B1.1 treats the sale-of-collateral credit

---

[2] The amount of the intended loss is not in issue here, as there is no dispute that the provable actual loss is greater than the provable intended loss, and thus the actual loss amount controls pursuant to Application Note 3(A).

calculation as a separate and distinct analysis from the calculation of the reasonably foreseeable loss amount. It follows that this "credit against loss" provision does not require the amount of this credit to be reasonably foreseeable. To the contrary, the credit against loss provision emphasizes that the loss may be reduced only by the amount actually recovered or by the amount that is recoverable *at the time of sentencing*, whether or not the defendant had any idea what the collateral's value would be by that time. *See id.* (using fair market value of collateral at time of sentencing "if the collateral has not been disposed of by that time").

Taken together, these provisions teach a two-step approach for calculating the loss attributable to a defendant in home loan fraud cases such as this one. The first step is to calculate the reasonably foreseeable pecuniary harm resulting from the fraud. This amount will almost invariably include the full amount of unpaid principal on the fraudulently obtained loan, as an unqualified borrower's default is clearly a reasonably foreseeable "potential result of the offense" within the meaning of Application Note 3(A)(iv). After all, the entire purpose of loan qualification criteria is to reduce the risk to banks that debtors will default on their loans. Fraudulent misrepresentations concerning borrowers' qualifications cause banks to assume a risk of default and, as discussed below, a risk that the value of the collateral will decrease. Neither of these risks would have been assumed by the lender in the absence of fraud. Accordingly, the loss of the unpaid principal is an eminently foreseeable consequence of the fraudulent conduct.[3]

---

[3] This analysis—that the loss of the full amount of unpaid principal was reasonably foreseeable because defendant's fraudulent conduct caused the lenders to assume the risk of a market downturn and the resulting decrease in the value of collateral—is consistent with the tort law proximate causation analysis. Specifically, it has long been that "[w]here the . . . conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding harm." *Restatement (Second) of Torts* § 442A (citing cases).

Partial recovery of this loss through seizure and sale of collateral may reduce the net loss amount through operation of the "credits against loss" provision, but it does not diminish the foreseeability of the financial institutions' loss of the unpaid principal amounts in the first instance.

The second step in calculating the loss amount requires application of the "credits against loss" provision. In applying this provision, courts must deduct from the calculated loss the amount actually recovered or actually recoverable by the creditor from sale of the collateral. This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable by the defendant. Where the financial institutions have sold the collateral, courts should credit the amount actually recovered in the sale. Where the collateral is held by the institution at the time of sentencing, then the fair market value of the collateral at the time of sentencing is properly credited instead. By operation of Application Note 3(E)(ii), it is irrelevant whether the diminished value of the credit against loss was reasonably foreseeable to defendant, as the loss of the entire amount of unpaid principal was a reasonably foreseeable potential consequence of defendant's conduct. Accordingly, defendant is only entitled to a credit against loss in the amount actually recovered by the banks from sale of the subject properties.

This approach—requiring foreseeability of the loss of the unpaid principal, but not requiring foreseeability with respect to the future value of the collateral—is not merely the best reading of § 2B1.1; it is also necessary to ensure that defendants who fraudulently induce financial institutions to assume the risk of lending to an unqualified borrower are responsible for the natural consequences of their fraudulent conduct. This is so because among the risks that a bank assumes in agreeing to issue a home loan is the risk that in the event of default, the

foreclosure sale value of the home will be insufficient to allow recovery of the principal value due to market downturns or other events. In the lending institution's judgment, this risk is warranted only if the borrower satisfies certain employment, income, and asset requirements that render the likelihood of foreclosure sufficiently remote. Thus, by fraudulently misstating these factors, defendant and his coconspirators induced banks to assume the risk of a market downturn when the banks otherwise would not have assumed this risk with respect to the subject properties. Accordingly, irrespective of whether defendant could have predicted the foreclosure sale value of the subject properties at the time of sentencing, he should be held to account for the banks' actual losses as he fraudulently induced them to assume the risk that the value of the homes would decrease—a risk that was ultimately realized. Put another way, a defendant may not reasonably count on the expected sale value of collateral to save himself from the foreseeable consequences of his fraudulent conduct.

The parties cite no controlling circuit authority on this issue, and none has been found. Instead, the government and defendant rely on *United States v. Parish*, 565 F.3d 528, 535 (8th Cir. 2009) for the proposition that the sale value of the collateral must be reasonably foreseeable in order to govern the loss amount calculation.[4] In *Parish*, the Eighth Circuit confronted a case in which a subdivision developer, finding itself unable to sell all of its homes, applied for mortgages under the names of straw buyers. The fraud conspiracy eventually unraveled, and the

---

[4] Naturally, the government and defendant disagree on whether the decrease in the collateral sale value due to the market downturn was reasonably foreseeable to defendant. Ultimately, as noted, this disagreement, and the affidavits proffered in support of defendant's position on this dispute, are irrelevant as the reasonable foreseeability of the future collateral sale value does not factor in the analysis where, as here, the loss of the entire unpaid principal amounts was a reasonably foreseeable potential result of the fraud.

straw buyers defaulted on the home loans. The depression in the housing market and the resulting decrease in the value of the collateral resulted in the lending institutions suffering net losses of approximately $45 million on loan proceeds of $85 million. The *Parish* panel concluded that § 2B1.1 required that the decreased value of the subject properties be reasonably foreseeable in order to count in the loss calculation, but it held that this diminished value *was* foreseeable as the defendants had contributed substantially to the downturn in the local housing market through their fraudulent conduct. *Id.* at 535. For the reasons stated above, *Parish*'s interpretation of § 2B1.1 does not adequately account for the plain language of Application Note 3, which states clearly that the credit against loss is equal to the actual amount recovered or recoverable at sentencing, without reference to the foreseeability analysis. It is sufficient for the loss of the unpaid principal to be a reasonably foreseeable "potential result" of the fraudulent conduct, as it was here.

But even assuming, *arguendo*, that *Parish* was correctly decided, it is clear that the decrease in value of the subject properties in this case was reasonably foreseeable to defendant. The aggregate effect of defendant's fraudulent conduct and that of others engaging in similar illegal activity played a substantial and reasonably foreseeable role in the market downturn, and the record established that defendant was aware of the prevalence of fraud in the housing market.[5] As a direct participant in one of the schemes that collectively contributed substantially to the housing market downturn, defendant was, in fact, in a privileged position to forecast the collapse in prices once unqualified borrowers defaulted and the fraud underlying their loans was

---

[5] *See* Gov't Ex. 227 (e-mail message from defendant noting that banks "are investigating this stuff [possible mortgage fraud] HEAVY these days").

exposed. In light of defendant's direct participation in a mortgage fraud scheme, and of his awareness of the prevalence of such schemes in the housing market, he could not have reasonably relied on the value of the subject properties to mitigate the potential consequences of his illegal conduct.

### III.

In sum, when defendants—such as this defendant—fraudulently induce financial institutions to lend money to unqualified borrowers, it is ordinarily a reasonably foreseeable "potential result of the offense" that the borrower will default on the loan and the bank will lose the unpaid principal. And indeed, in this case, it was reasonably foreseeable to defendant that the unqualified borrowers, whose employment, income, and assets he fraudulently misrepresented to the lending institutions, would ultimately default on their loans. In these circumstances, the unpaid principal on these loans is the reasonably foreseeable pecuniary harm that constitutes the initial measure of loss for purposes of § 2B1.1. This measure of loss is appropriately reduced by the amount recovered by the banks from the sale of the subject properties, and computation of this credit is a separate and distinct calculation performed without reference to whether the recovered amounts were reasonably foreseeable. This conclusion results from reading the plain language of § 2B1.1 and its accompanying application notes, and from considering the policies underlying that section of the Guidelines. Thus, the § 2B1.1 loss in this case was properly

calculated to be $2,797,855, and the sentence imposed and the restitution judgment entered correctly reflected this loss amount accordingly.

Alexandria, Virginia  
June 23, 2010

/s/  
T. S. Ellis, III  
United States District Judge